FRANK L. PALMER & OTHERS *vs.* THE HARTFORD FIRE INSURANCE COMPANY.

New London Co., Oct. T., 1886. PARK, C. J., CARPENTER, PARDEE, LOOMIS and GRANGER, Js.

The plaintiffs had held a policy of insurance of the defendants upon a quantity of merchandise, and on the policy expiring applied to the defendants for a renewal policy to be on the same terms with the expiring one, which the defendants promised to give. The defendants wrote and delivered to them a new policy and received the premium. The plaintiffs, supposing it to be on the same terms with the first, did not examine it until after the loss of the property by fire three months later, when, on reading it, they discovered an important variance from the former policy, materially affecting their right of recovery. If they had known of the change they would not have accepted the policy. In a suit for the reformation of the policy and a recovery of what would become due under it, it was held that the plaintiffs could not be regarded as guilty of laches in not examining the policy and applying earlier for its correction, since they had a right to believe it to be in all essential respects like the former one.

The defendants, having promised that the new policy should be on the same terms with the first one, were not in a position to charge the plaintiffs with neglect in not discovering that it was not so.

No written contract is beyond the reach of a court of equity for the purpose of reforming it, if the prayer for relief is presented in due season.

There is of course a strong presumption in favor of the written agreement over a mere oral one by which it is sought to be corrected, and the prayer for relief in such a case must be supported by overwhelming evidence or be denied.

[Argued January 13th—decided February 11th, 1887.]

SUIT for the reformation of a policy of fire insurance and for the recovery of the amount due on the policy when reformed; brought to the Superior Court in New London County.

The complaint alleged that prior to the 15th of May, 1884, the plaintiffs had insured certain goods in the office of the defendant, a fire insurance company in the city of Hartford, to the amount of $5,000, for one year, for a premium of $50, and that the policy was to expire on the 15th of May above mentioned; that the defendant proposed to the plaintiffs to renew the insurance on the same terms and conditions stated in the expiring policy, and issued a policy therefor for one year for the same premium, which proposition was accepted by the plaintiffs and the premium paid; that the new policy differed from the old one in containing the following clause which was not in the other:—" *Co-insurance Clause.* If the value of the property at the time of any fire shall be greater than the amount of the insurance thereon, the insurer shall be considered as co-insurer for such excess, and all losses shall be adjusted accordingly;" that the plaintiffs, relying on a faithful performance of the agreement on the part of the defendant to reinsure the property, and supposing the new policy to be of the same tenor as the one that the plaintiffs then held, omitted to examine or read the same, and did not know of the change till after the fire; that the new clause entirely changed the character of the insurance, and that the plaintiffs would not have paid the premium, nor received the new policy, had they known that the new clause was inserted therein; and had the defendant refused to perform its agreement the plaintiffs would have secured other insurance

elsewhere of the same character as that which they had by the first policy, which they could have easily done for the same price; that the goods on the 17th of August, 1884, were partly destroyed and greatly damaged by fire; that at the time of the insurance and of the fire they were of the value of $37,354; that the plaintiffs' loss was $5,218; that there was other insurance to the amount of $5,000, by reason of which the defendant was liable to pay only half the loss, namely, $2,609; and that the defendant refused to correct the policy, or issue one in conformity to the agreement, and insisted that the co-insurance clause should stand, and that it was not bound to pay more than it would be under the policy as it stands; praying for a correction of the policy in accordance with the agreement, and for a recovery of the money which they would be entitled to recover under the amended policy.

The defendant demurred to the complaint, assigning the following grounds of demurrer:—

1. Upon the facts stated in the complaint, the plaintiffs are not entitled to the relief sought.

2. The complaint does not aver that there was a mutual mistake between the parties as to the terms of the policy of insurance, or any agreement between them as to the specific terms of the new policy.

3. The plaintiffs were guilty of gross laches in not examining their policy, and thereupon notifying the defendant of their claim, so that the defendant might, before any loss have exercised its right of rescission.

The court (*Torrance, J.,*) sustained the demurrer and rendered judgment for the defendant. The plaintiffs appealed.

*S. Lucas,* for the appellants.

1. It is alleged in the complaint that there was an agreement between the parties as to the specific terms of the policy to be issued, for it is alleged that the defendant proposed to the plaintiffs to renew the insurance of $5,000, for the same premium and on the same terms and conditions con-

tained in the first policy. That policy being made a part of the complaint, the specific terms of the policy to be issued were definitely determined, and the proposition made by the defendant having been accepted, became the original contract of the parties. 1 Parsons on Cont., 483; May on Ins., § 45.

2. It was not necessary to aver that there was a mutual mistake between the parties as to the terms of the policy to be issued. There was no mistake on the part of either. It stands uncontradicted that the insurance sought by the plaintiffs is the one the defendant by its contract had agreed to give, and hence there could be no mistake in regard to that on the part of either party. The cause of complaint is that the defendant has not performed the contract admitted by the demurrer. It had agreed to deliver to the plaintiffs a policy of a certain character. It has not done it, but has delivered a policy of an entirely different character. Does it make any difference whether the defendant failed to do it by mistake or by design? If it delivered the policy by design, in violation of its contract, without disclosing its true character, then it was guilty of a fraud; and if guilty of a fraud, it is without excuse, and the contract should be enforced. *Story* v. *Norwich & Wor. R. R. Co.*, 24 Conn., 113; *Town of Essex* v. *Day*, 52 id., 496; 1 Story Eq. Jur. § 187. The rule that a mistake must be mutual or a court will not reform a contract, is, in its proper application, founded in reason; and the reason is this: If a contract is corrected by a court of chancery, to make it conform to the intention of one of the parties, it is of course forcing a contract upon the other party which he never intended to make, unless his own intent concurred with that of the other party. *Town of Essex* v. *Day*, supra. But that is not this case. The plaintiffs are not seeking to force a contract on the defendant which it never made, but to enforce a contract it did make, and which became obligatory before a policy was delivered. May on Ins., § 14; *Sheldon* v. *Conn. Mut. Life Ins. Co.*, 25 Conn., 207. If upon an agreement for insurance a policy be drawn by the insurance office, in

a form which differs from the terms of the agreement, and varies the rights of the parties insured, equity will interfere, and deal with the case on the footing of the agreement, and not on that of the policy. Kerr on Fraud & Mistake, 422.

3. The plaintiffs were not guilty of such laches as should deprive them of equitable relief. It comes with a poor grace from the defendant who committed the error or fraud, to blame the plaintiffs for trusting to it to do as it agreed and not detecting the error. This was not an instrument signed by the plaintiffs or given by them; it was simply re-ceived by them under the misapprehension that it was right, which misapprehension was induced by the confi-dence they put in the defendant. And then it should be kept in mind that they had made a contract with the defendant whereby it was legally, as well as morally, bound to issue the proper policy. Courts have granted relief in cases very much stronger for defendants than this; and that, too, when there was no prior agreement on which to base the claim for relief. *Wooden* v. *Haviland,* 18 Conn., 101; *Town of Essex* v. *Day,* 52 id., 492.

4. If the defendant was deprived of any right of rescission it was caused by its own neglect or wrong. If it delivered the policy by mistake, it was its mistake. If by design, it was its own fraud. What claim on the plaintiffs has the defendant, simply because they omitted to detect its own mistake or fraud, by reason of the confidence they reposed in it?

*H. C. Robinson* and *C. E. Perkins,* for the appellees.

1. The general rule is well settled that where parties have once reduced their agreement to writing, and it has been delivered and received, no evidence of previous nego-tiations or arrangements, whether verbal or in writing, can be received to add to, alter or contradict the terms of the written instrument. This is the well-settled rule both at law and in equity. The rule is uniform at law, but there are certain exceptions to it in equity. These are that if one party to the contract has been guilty of fraud, by which the

contract is made different from what it was agreed to be, or if it is so made by the *mutual mistake of the parties*, equity will interfere, and make the contract what it should have been; but these are the only grounds. The subject is fully treated in 1 Story's Eq. Jurisprudence, §§ 154, 155. In *Hearne* v. *Marine Ins. Co.*, 20 Wall., 488, Judge SWAYNE says, on page 490: " The reformation of written contracts, for fraud or mistake, is an ordinary head of equity jurisdiction." It is evident that no claim can be made under the head of fraud, for no fraud is alleged, and, as is said in *Crocker* v. *Higgins*, 7 Conn., 346, " unless fraud is alleged in the bill, it cannot be presumed or proved in aid of the plaintiff's case." And as to mistake, in the first place, it is not alleged that there was any mistake of any kind by either party in making the policy, nor that there was an accidental mistake of the scrivener or clerk in drawing it, nor that there was a mutual mistake. But the real ground of the claim appears from the latter part of the complaint, where the plaintiffs allege that there was a mistake on *their part alone.* They allege that they received the policy as it is, but did not look at or read it, and, if they had done so, they would not have received it, but would have refused to take it, and applied elsewhere for other insurance; that thereby they were mistaken as to what the policy really was, received it under such mistake, and now, after the fire, want the policy reformed to make it what they supposed it was going to be. This was the claim made by the plaintiffs below, and the real question in the case is, whether if these allegations are true this court will interfere. Nothing can be better settled than that in such a case no relief will be granted. The mistake must be a mutual one; both parties must have done what neither intended to do. *German Ins. Co.* v. *Davis*, 131 Mass., 316; *Hearne* v. *Marine Ins. Co.*, 20 Wall., 488; *Spare* v. *Ins. Co.*, 13 Ins. Law Journal, 286; *Brugger* v. *State Investment Ins. Co.*, 5 Sawyer, 310; *Paine* v. *Jones*, 75 N. York, 593; *Malleable Iron Works* v. *Phœnix Ins. Co.*, 25 Conn., 465; *Brainard* v. *Arnold*, 27 id., 624;

*Woodbury Savings Bank* v. *Charter Oak Ins. Co.*, 31 id., 517; *Bishop* v. *Clay Ins. Co.*, 49 id., 167.

2. An additional reason for not granting the relief asked for, is the gross negligence of the plaintiffs in not examining the policy when given them, and not until after the fire. It is a well settled principle that equity will not relieve where the applicant has been guilty of negligence, and this principle has often been applied to this question of the necessity of reading contracts received from another. It has many times been set up as a defense that the party did not read the contract delivered to him in performance of an agreement, but not successfully. In *Bishop* v. *Clay Ins. Co.*, 49 Conn., 167, the court say, (p. 172:) "Now, if they exercised ordinary diligence and caution in caring for their own interests, we may assume that they examined the policy when received, and were satisfied that it was right." In *Ryan* v. *World Life Ins. Co.*, 41 Conn., 172, the court says: "She says that she and her husband signed the application without reading it, and without its being read to them. That of itself was inexcusable negligence." In *Grace* v. *Adams*, 100 Mass., 507, the court says: "It was his duty to read it. The law presumes, in the absence of fraud or imposition, that he did read it, or was otherwise informed of its contents, and was willing to assent to its terms without reading. Any other rule would fail to conform to the experience of men. Written contracts are intended to preserve the exact terms of the obligations assumed, so that they may not be subject to the chances of a want of recollection or an intentional misstatement. The defendants have a right to this protection, and cannot be deprived of it by a willful or negligent omission to read the paper." In *Monitor Ins. Co.* v. *Buffum*, 115 Mass., 345, the court says: "In the absence of fraud he is conclusively presumed to assent to those terms. He cannot be permitted to qualify his contract, or his relations to the subject matter, by asserting and proving that he never read the writing and was ignorant of its contents." The Supreme Court of Pennsylvania in the very late case of *Susquehanna Ins. Co.* v. *Swank*, 102 Penn. St.,

17, where the insured, when he signed his application, was assured by the agent that his policy should be written on the "annual interest" plan which required no assessment, but whose policy, in fact, was written on the assessment plan, and who retained the policy from June 9th, 1877, until September or October of the same year, when he sent it to the agent with protests, and in October of the following year returned it to the company, held that it was his duty to read the policy, and that after retaining it as he did, without examination, a court of equity would not interfere, and say: " During all this time he had the benefit of the insurance. In case of loss the company would have been liable. An instrument may be reformed in case of fraud, accident or mistake, but where the mistake was the result of the supine negligence of a party who sleeps upon his rights until other duties and responsibilities have grown up, the law will not help him." ' The Supreme Court of the United States in the recent case of *N. York Life Ins. Co.* v. *Fletcher*, 117 U. S. R., 519, remarks upon the duty of examining insurance policies, and the effect of receiving them without reading. The opinion says, p. 534: "He would have discovered by inspection that a fraud had been perpetrated. The retention of the policy was an approval of the application and its contents. The consequence of that approval cannot after his death be avoided." The opinion then cites approvingly the case of *Am. Ins. Co.* v. *Neiberger*, 74 Misso., 167, where the assured agreed with the agent that the policy to be issued should contain a clause giving him the right to cancel at the end of a year. The policy contained no such clause, but he retained it from January 25th till May 10th, 1875. The court in that case said: "It will be the duty of the insured when he receives the policy, promptly to examine it. After such delay he will be deemed to have accepted the policy as issued." The same case approves of *Richardson* v. *Maine Ins. Co.*, 46 Maine, 394, where, without the applicant's knowledge, the agent of the insurance company had falsely stated that there was no mortgage upon the property insured. The policy did not set out the

application, except by reference, but the court held "that the assured by accepting the policy was bound by its covenants and ratified the application." These authorities are sufficient to show the views of courts on this subject. We do not claim that the mere fact that the plaintiffs did not look at the policy is, in all cases, conclusive evidence of laches as a matter of law. It may be explained; sickness, false statements by the other party, and other circumstances may excuse it; but here the plaintiffs allege no such facts, as it was their duty to do if there were any. Again, the plaintiffs were bound to know from the fact that a new policy was given to them, that it was not a mere renewal of the old one. It is not alleged, nor is there any pretence, that, in fact, the old policy was renewed with all its specific terms and conditions. The allegations relative to the preliminary negotiations, which are only formally admitted to be true by the demurrer, for purposes of pleading, without reference to their actual truth, do not claim that. The substitution of a new policy for the existing one, as asked by the plaintiffs, forms of course a new contract. The very fact that the policy is a new one is proof conclusive that it is not the old one, and the fact that an additional clause was inserted shows that it was not done by mistake, but was intentional on the part of the defendants. It is not like the case of a clause omitted, which might be done by accident. The court is therefore asked to change a contract which is just what the defendants intended that it should be. It has always been held that this cannot be done. This is not a bill for a specific performance of the parol agreement which it alleges. That agreement has been executed and the policy delivered and accepted, so that that parol agreement has done its office and is now out of the case. No such claim was made in the court below, nor is the bill or prayer framed for such relief. The counsel for the plaintiffs will probably rest their case principally upon the late case of *Essex* v. *Day*, 52 Conn., 483, and will claim that that decision changed the law not only as to laches, but also as to the necessity of mistakes being mutual, but we submit

that it was not the intention of the majority of the court to do either, but merely to say that in the peculiar circumstances of that case they did not find ground for the application of either of those principles, or found other facts which took the case out of such application. Laches begins to be imputed especially soon in contracts of a speculative or precarious nature, and most of all in cases where a party has an arbitrary right of cancellation. The retention of a policy of insurance was held by the Supreme Court of the United States in a very early case, *Graves* v. *Boston Marine Ins. Co.*, 2 Cranch, 419, in which MARSHALL, C. J., gives the opinion, to be a very significant act, and one which, after the loss occurred, should be quite binding upon the assured. This case, and the principles for which we contend, were affirmed in the case of *Snell* v. *Atlantic Ins. Co.*, 98 U. S. R., 90, and the latest utterance of that high authority is in harmony with all its earlier ones and with the decisions cited from our own courts. We submit that it would be a very dangerous precedent to establish, that an intelligent manufacturer should be allowed to disclaim the provisions of a written contract of fire insurance, accepted by him without reserve, months after the transaction, and when the property has been consumed and the right of cancellation by the company in case of misunderstanding has been forever lost. It is putting a reward upon gross inattention which will in the end sharply re-act upon the general interests of community. The plaintiffs must have known from the physical form of the contract itself that it was a new policy and not a renewal of the old one. There is no suggestion of concealment by the company, nor of intellectual inferiority of the plaintiffs. Their laches was too palpable to be relieved by the sound discretion of a court of equity.

PARDEE, J. The complaint in this case is in effect as follows: Prior to May 15th, 1884, the defendant had issued to the plaintiffs a policy of insurance against loss by fire upon merchandise; on that day it expired; on that day the

defendant proposed to them to renew the insurance upon the terms and conditions of the expiring policy, the plaintiffs accepted the proposition; the defendant wrote a policy, delivered it to, and received the premium from the plaintiffs; they, relying upon the fidelity of the defendant to its promise, and supposing the last written policy to contain the same stipulations and conditions as were in the first, omitted to read it. The merchandise was damaged by fire on August 17th, 1884; subsequently the plaintiffs for the first time discovered that the last policy contained this condition, which was not in the first: "Co-insurance clause. If the value of the property at the time of any fire shall be greater than the amount of the insurance thereon, the insurer shall be considered as co-insurer for such excess, and all losses shall be adjusted accordingly." In this respect the last policy materially differs from the first. The plaintiffs would not have accepted the policy and paid the premium if they had known that it contained this clause; and if the defendant had notified them of its refusal to perform its agreement, they could and would have obtained elsewhere, at the same price, the desired insurance upon the stipulated terms. The defendant refuses either to correct the policy or perform the agreement. The plaintiffs ask that the policy may be reformed so as to express the agreement, and that the defendant be compelled to perform the agreement and pay the indemnity promised by it. The defendant answers by demurrer, assigning therefor the following reasons:—"that upon the facts stated the plaintiffs are not entitled to the relief sought; that the complaint does not aver that there was a mutual mistake between the parties as to the terms of the policy or as to the agreement for one; and that the plaintiffs were guilty of gross laches in not reading the policy, and in not notifying the defendant of their claim, so that it might have exercised its right of rescission before loss.

The Superior Court held the complaint to be insufficient. The plaintiffs appeal, assigning the following reasons:—

1. The court erred and mistook the law in rendering judgment in favor of the defendant to recover costs.

2. In not holding that the plaintiffs were entitled to recover at least the amount of loss covered by the policy, as delivered to the plaintiffs by the defendant.

3. In holding that upon the facts stated in the complaint the plaintiffs were not entitled to the relief sought.

4. In holding that the plaintiffs should have averred in their complaint that there was a mutual mistake between the plaintiffs and defendant as to the terms of said policy.

5. In holding that there was no allegation in the plaintiffs' complaint of an agreement between the parties as to the specific terms of the new policy that was to be issued.

6. In not holding that, as the defendant had agreed to renew said insurance on the same terms and conditions as stated in the old policy, for the same premium, and issue a policy therefor, it was immaterial under the circumstances in this case whether the failure to perform said agreement on the part of the defendant was by mistake or design.

7. In holding that the plaintiffs were guilty of such gross laches in not examining the new policy that they are not entitled to relief, and in holding that the defendant was excused in the performance of its contract because the plaintiffs did not detect its omission to deliver such a policy to the plaintiffs as it agreed to, till after the fire.

8. In holding that it was the duty of the plaintiffs to detect, and notify the defendant of, an alteration which the defendant made, and in the very nature of the case must have had knowledge of, to wit, the changes in the terms and conditions of the new policy from those in the old.

9. In not holding that the plaintiffs were entitled to a correction of said last named policy in the manner sought, and to specific performance of the agreement stated in paragraph ten, and to judgment for the amount that would be due by said policy, when corrected, by reason of said loss by said fire.

For the purpose of testing the sufficiency of the pleadings

we are to assume that the defendant admits that an agreement between it and the plaintiffs for indemnity against loss by fire, containing every stipulation and condition which should enter into or affect it, was reduced to writing, and that the defendant agreed to make and sign a copy thereof, except as to the dates of commencement and termination of risk, and deliver the same to the plaintiffs; that it wrote and signed a policy of insurance, and delivered it to the plaintiffs as and for a performance of its promise, and received the stipulated premium, without notice to them that an important and variant condition had been added to those contained in the first written agreement; and that the plaintiffs, trusting to the defendant's fidelity to its undertaking, omitted to examine the policy for the purpose of discovering variances from the written draft, and did not in fact discover the variance until after damage to the property for which indemnity had been sought.

The presence of the variant clause in the delivered instrument is of necessity due either to intention or mistake upon the part of the defendant. To attribute it to the former is to charge constructive fraud at least; and inasmuch as the plaintiffs have not charged this specifically, if we accede to the rule of law invoked by the defendant, that unless fraud is so charged it is excluded from the case, there remains the other and only possibility, namely, mistake; and upon a fair interpretation of the allegation, this, the only possible legal meaning, is to be attributed to it, namely, that the writing, which by the agreement of the parties should have been a copy of a previously written draft, did in fact contain a variant and material clause, which neither of them desired or intended that it should contain, and which neither party would knowingly have permitted to be in it. This meaning the defendant should have found therein, and to it made answer.

That it is a most frequent and useful office of a court of equity to reform written contracts, and make them conform to the verbal agreement or written draft which of necessity precedes them, is in the knowledge of all, and it is suffi-

ciently accurate to say that no writing is beyond its reach if the prayer for relief is presented in due season and supported by convincing evidence. Of course the presumption in favor of the written over the spoken agreement is almost resistless; and the court has wearied itself in declaring that such prayers must be supported by overwhelming evidence or be denied. But in the case at bar the defendant volunteers to lift this burden from the plaintiffs, and upon the pleadings admits that the delivered policy is materially variant from the precedent written draft agreed upon.

There are many precedents for the reformation of policies of insurance in cases where the insured has held the policy until after a loss in silence and in ignorance of the necessity for such reformation,—ignorance because of the omission to read the policy or of a careless reading. A few are cited.

In *Andrews* v. *Essex Ins. Co.*, 3 Mason, 10, STORY, J., said:—" There cannot at the present day be any serious doubt that a court of equity has authority to reform a contract where there has been an omission of a material stipulation by mistake. And a policy of insurance is just as much within the reach of the principle as any other written contract. But a court of equity ought to be extremely cautious in the exercise of such an authority, seeing that it trenches upon one of the most salutary rules of evidence, that parol evidence ought not to be admitted to vary a written instrument. It ought therefore in all cases to withhold its aid where the mistake is not made out by the clearest evidence according to the understanding of both parties, and upon testimony entirely exact and satisfactory. There is less danger where the instrument is to be reformed by reference to a preliminary written contract which it was designed to execute. But even here there is abundant room for caution, since the parties may have varied their intentions, or the clause may not have been originally understood by either party to go to the extent now required. And these considerations acquire additional force where circumstances have occurred in the intermediate time which give an increased importance to

the asserted mistake. Under these limitations the doctrine of courts of equity on this subject does not seem at variance with general convenience or justice."

In 1 Story's Equity Jurisprudence, § 159, it is said as follows :—" The relief granted by courts of equity in cases of this character is not confined to mere executory contracts, by altering and conforming them to the real intent of the parties ; but it is extended to solemn instruments which are made by the parties in pursuance of such executory or preliminary contracts, and indeed, if the court acted otherwise, there would be a great defect of justice, and the main evils of the mistake would remain irremediable. Hence, in preliminary contracts for conveyances, settlements, and other solemn instruments, the court acts efficiently by reforming the preliminary contract itself, and decreeing a due execution of it as reformed, if no conveyance or other solemn instrument in pursuance of it has been executed. And if such conveyance or instrument has been executed, it reforms the latter also by making it such as the parties originally intended."

In *Oliver* v. *Mut. Commercial Ins. Co.*, 2 Curtis, 277, the marginal note is as follows :—" If a policy when drawn and received does not correctly express a previously concluded agreement for insurance which it was designed by both parties to execute, equity will reform it. If underwriters conclude an agreement for insurance with one known to them to be merely an agent and nothing is said as to whose account the insurance is to be made upon, the agent has a right to a policy insuring him as agent, or for whom it concerns. If the agent makes a mistake in declaring the interest, equity requires it to be corrected and the policy reformed. There is a distinction between the correction of a mistake in a written contract and in the execution of a power. In the latter case courts interpose more willingly. But if the agent did not declare the interest in the wrong person by mistake, but through a fraudulent design, equity will not relieve the principal. If a party fails through mistake to obtain such a policy as he is entitled to by an

existing valid contract, equity will relieve, though the mistake arose from ignorance of law."

In *N. Amer. Ins. Co.* v. *Whipple*, 2 Bissell, 419, the court says:—"It is easy to see how, in the filling up of printed blanks, a mistake like that alleged by the complainant might happen; and the policy clerk says that it occurred from the fact that he was accustomed in the majority of instances to fill up yearly policies. All the other policies were made out for two months; that is, they expired on the 22d of December, 1864, instead of the 22d of December, 1865. This is not contradicted by the defendant. The defendant himself, who personally procured this insurance, has no recollection, or does not testify to any, in regard to what transpired at the time he applied for the insurance. He admits that he obtained the insurance at the time mentioned, but does not profess to remember the time the policies were to run, from anything he can now recall of the transaction. It is shown in the proofs, and I presume it would be taken notice of without proof, that fourteen months is an unusual time for the life of an insurance policy. The usual time is two, three, four, six and twelve months, and if for any reason the defendant had had occasion to apply for a policy so much out of the usual course of business, it would have made some impression upon his memory and that of the clerks and agents of the insurance·company who participated in the transaction. So also the fact that only so small an amount was paid for a policy having so long a time to run, would seem to be a circumstance calculated to excite attention and impress itself upon the memory. It is true that the defendant testifies that he afterwards sent his policies to the insurance agents to have them looked over and mistakes corrected; but both the agents deny that they ever saw this policy and assert positively that they supposed the same had expired on the 22d of December, 1864, and had so entered the same on their books, and so informed the complainant, and had no knowledge that the policy in question was claimed to be in force until after the fire. Under the evidence in this case I can but conclude that the substantial allegations

in the bill are made out by the proofs, and that the complainant is entitled to the relief prayed for."

In *Phœnix Fire Ins. Co.* v. *Gurnee,* 1 Paige, 278, the marginal note is as follows :—" A court of chancery has jurisdiction to correct mistakes in policies of insurance as well as in all other written instruments. The evidence of the mistakes in all cases should be clear and satisfactory." Chancellor WALWORTH said in this case :—" It is well settled that a court of equity has jurisdiction to correct mistakes in policies of insurance as well as in all other written instruments. Phill. on Ins., 14. But the evidence of such mistake, and that both parties understood the contract in the manner in which it is sought to be reformed, should be clear and satisfactory. In policies of insurance the label or written memorandum from which the policy was filled up is always considered of great importance in determining the nature of the risk and the intention of the parties. Thus, in *Motteaux* v. *London Insurance Company,* (1 Atk., 347), Lord HARDWICKE held that a policy ought to be rectified agreeably to the label ; and in the issues which he directed in that case the label was treated as the real contract between the parties. In this case there is a substantial difference between the policy and the written memorandum on which it is founded."

In Wood on Fire Insurance, § 484, it is said as follows :— " When an application for insurance is made and accepted, and a policy is issued which, either by mistake or fraud on the part of the insurer, essentially varies from the contract made, and the policy is not seen or examined by the assured until after the loss thereunder occurs, he is not estopped from seeking a reformation of the contract upon the ground that he accepted the policy. Thus, where the plaintiffs entered into a contract for insurance with the defendant's agent and paid him the premium and took from him a receipt stating that the insurance was for $10,000 upon " merchandise, generally contained in their three story brick building, metal roof, and occupied by them as a commission house," and a policy was issued containing all the

provisions of the contract except the words "*as a commission house,*" and the policy was received by a clerk of the plaintiffs, and its terms were not known to the assured until the loss, it was held that, "inasmuch as the insured refused to pay the loss upon goods held by commission, the assured were entitled to have the policy made to conform to the agreement, and could not be said to have accepted the change in the contract as indicated by the policy. The fact that proceedings are not instituted for its reformation until after a loss does not of itself bar the remedy. It is a circumstance to be taken into consideration in connection with other circumstances in determining whether the plaintiffs waived the variance, but, if the delay is excused, the remedy remains."

*In Van Tuyl* v. *Westchester Fire Ins. Co.,* 55 N. York, 657, the plaintiffs procured insurance upon their stock and materials in their manufactory. One of the printed conditions declared it void in the case of the establishment running, in whole or in part, over or extra time, or running at night, without special agreement. The plaintiffs gave evidence to show that they previously insured with the defendant, but had the policy canceled because of the condition above mentioned being in it; that the plaintiffs' agent informed the defendant that the United States Insurance Company of Baltimore was writing on the property, and that their policy did not contain that clause; that the defendant thereupon agreed to write as the other companies did and to follow the form of the United States policy, which the plaintiffs were to and did furnish for the defendant to copy. The plaintiffs thereupon produced a blank form, which the witness testified was a blank policy of the latter company. This was offered in evidence and was objected to upon the ground that the copy shown the defendant should be produced, and that a blank form not filled up was not proper evidence. The objection was overruled, and the defendant excepted. The plaintiffs also gave evidence tending to show that they did not discover that the permission required was not in the policy until after the fire. The

evidence as to the agreement was denied by the defendant's agent who effected the insurance. It was held that the plaintiffs were entitled to have the policy reformed. See also *N. Y. Ice Co.* v. *N. Western Ins. Co.*, 23 N. York, 357; *National Fire Ins. Co.* v. *Crane*, 16 Md., 260; *Harris* v. *Columbia Ins. Co.*, 18 Ohio, 116; *Weed* v. *Schenectady Ins. Co.*, 7 Lans., 452; *Bidwell* v. *Astor Ins. Co.*, 16 N. York, 263; *Brioso* v. *Pacific Mut. Ins. Co.*, 4 Daly, 246; *Bunten* v. *Orient Ins. Co.*, 2 Keys, 667; *Malleable Iron Works* v. *Phœnix Ins. Co.*, 25 Conn., 465; *Bennett* v. *City Ins. Co.*, 115 Mass., 241; *Moliere* v. *Penn. Fire Ins. Co.*, 5 Rawle, 342; *National Traders' Bank* v. *Ocean Ins. Co.*, 62 Maine, 519; *Lippincott* v. *Ins. Co.*, 3 La., 546; *Franklin Ins. Co.* v. *Hewitt*, 3 B. Monr., 202; *Law* v. *Warren*, 6 Irish. Eq., 299.

In *Nat. Traders' Bank* v. *Ocean Ins. Co.*, 62 Maine, 519, it is said as follows:—" This is a bill in equity asking the court to reform an insurance policy. The authority of the court to grant the relief prayed for is conceded. The only question is whether the evidence of mistake is such as to justify the court in exercising its authority. . . . As there can be no recovery upon the policy as it is now written, for the reason that between the voyage insured and the one actually made by the vessel there would be apparently a fatal deviation, the plaintiffs ask to have the policy reformed so that it will describe the voyage correctly. We think the relief prayed for should be granted. Where, as in this case, an insurance company undertakes to insure the charter of a vessel after being informed that no copy of the charter has been received, and it is not known how many ports she will be required to use, and through mistake the policy is so written as to limit the vessel to the use of one port when in fact her charter requires her to use two, we think a court of equity should order the policy reformed so as to make it describe the voyage correctly. The mistake in this case seems to be established beyond the possibility of doubt. The policy and the charter are both written instruments. A comparison of the two demonstrates that the voyage described in the charter is misdescribed in the policy.

Can there be any doubt that the misdescription was the result of mistake? We think not. It is impossible to believe that the applicant for insurance knowingly paid the premium for a void policy. Nor would it be just to the officers of the insurance company to suppose that they took a premium for a policy known to them to be of no value. The conclusion is therefore inevitable, that the misdescription was the result of a mistake—a mutual mistake—a mistake in which both parties participated; and we think equity and good conscience require that it should be corrected."

In *Buckland* v. *Adams Express Co.*, 97 Mass., 132, the court said:—" On a consideration of the facts stated, it does not appear to us that the plaintiffs ever did agree that the merchandise in question should be transported on the terms set forth in the receipt which was delivered to the workman at the manufactory when the package was delivered to the defendants' agent. It is not stated that the plaintiffs or either of them ever read the paper containing the alleged regulations or one similar to it. It is agreed that the defendants received and carried like packages of merchandise for the plaintiffs at or about the time the one in controversy was delivered for carriage without giving the plaintiffs any receipt whatever therefor, and that this was the course of dealing between the parties in a large majority of the instances in which the defendants had been employed by the plaintiffs. From this it would appear that the ordinary course of business was for the defendants to receive merchandise from the plaintiffs without attempting to limit their liability as carriers in any manner whatever. Under these circumstances we cannot fairly infer that the plaintiffs understood that by the delivery of a receipt for the merchandise the defendants intended to limit the liability which they ordinarily assumed in their dealings with the plaintiffs, or that the latter understood and assented to the contents of such receipt as fixing the terms on which the defendants were to transport the merchandise."

In *National Fire Ins. Co.* v. *Crane*, 16 Maryland, 295, the court said: " Whatever effect the want of such an indorse-

ment may have at law in an action on the policy, we think it cannot be urged in a court of equity, in a cause otherwise free from objection. The judge below has correctly stated the law on the subject. The indorsement could have been made only by the company. If it be omitted, who is to blame? Certainly not the assured. These policies contain many stipulations, some of them operating as conditions precedent for the benefit of the company, and few for that of the assured. It is too common for applications to be met and adjustment refused on frivolous and unjust pretences, in order to defeat fair claims on contracts of which good faith is the very essence, and we think it would promote the interest of insurance companies, and tend to a higher state of morals in business transactions, if they would exhibit more readiness to settle demands upon them, than, as we discover from the numerous reported cases on the subject, appears to be usual with them. In this case the president of the company dictated the application himself; the prior insurance was made known to him; the parties relied upon him; they never went to the office of the company, he came to the counting-house of the complainant, seeking the risk, and after hearing all they had to say on the subject he departed, and soon after sent the policy and received the premium, his clerk saying that it was all right, the only defect, however, being that the company had omitted part of its own duty in not indorsing the former insurance. In such a case we are called upon to say that the party is without remedy. On the contrary, we think it would be a reproach to the jurisprudence of the state if this company were discharged from their contract on any such grounds. There is a distinction in cases where the preparation of an instrument belongs to the party to become liable under it; he ought in that case to be dealt with more strictly. 19 Ves., 257. Insurance contracts are within this principle, and equity will interpose not only in cases of fraud, but also of mistake, where a policy is drawn up in a form different from the application, or anything is omitted which it is the duty

of the company to insert or indorse on the instrument.
*Collett* v. *Morrison*, 32 Eng. Law & Eq. R., 171."

In *Bidwell* v. *Astor Ins. Co.*, 16 N. York, 266, it is said:
" That the contract of insurance agreed to be made by the
defendants was such in its character as the plaintiffs have
alleged in their complaint, has been found by the judge and
is conclusive upon us. The fact on which the appellants
rely, that the policy actually made out was in the plaintiff's
hands for a considerable time and until the loss had oc-
curred, was a circumstance to be weighed by the judge as
bearing upon the truth of the plaintiff's allegation that the
policy did not pursue the contract. It has undoubtedly
been considered by the judge, and his judgment has been
given, notwithstanding that circumstance, in favor of the
plaintiff. There is no rule of law which fixes the period
within which a man may discover that a writing does not
express the contract which he supposed it to contain, and
which bars him of relief for delay in asserting his rights,
short of the period fixed by the statute of limitations.
*Phœnix Fire Ins. Co.* v. *Gurnee*, 1 Paige, 278."

It is a matter of common knowledge that a policy of in-
surance against fire, at the present day, is a lengthy con-
tract, which, after specifying the main things, namely, the
subject, its location, the owner, the amount, the time and
the price, embodies very many stipulations and conditions
for the protection of the underwriter. If a person desiring
indemnity against loss applies to the underwriter and states
the main things above enumerated, and says no more, he
has knowledge that he has asked for and will receive a con-
tract which, in addition to those, will contain many limit-
ing conditions in behalf of the party executing it; and
when he receives the policy he cannot avoid seeing and
knowing that there are many more stipulations in it than
were covered by his verbal request. It may well be that a
due regard for the rights of others requires him to examine
those stipulations, and express a timely dissent, or be held
to an acceptance thereof. Nothing which has previously
transpired between him and the underwriter furnishes jus-

tification for omission to read them. The underwriter has not invited his confidence by any promise as to what the writing shall contain or omit.

But if the underwriter solicits a person to purchase of him indemnity against loss by fire, and if they unite in making a written draft of all the terms, conditions and stipulations which are to become a part of or in any way affect the contract, and if the underwriter promises to make and sign a copy thereof, and deliver it as the evidence of the terms of his undertaking, and if a material and variant condition is by mistake inserted, and the variant contract is delivered, and the stipulated premium is received and retained, the court will not hear the claim that he is entitled to the benefit of the variant condition, where the other party had neither actual nor imputed knowledge of the change. In his promise to make and deliver an accurate copy, there is justification before the law for the omission of the other party to examine the paper delivered, and for his assumption that there is no designed variance. A man is not for his pecuniary advantage to impute it to another as gross negligence, that the other trusted to his fidelity to a promise of that character.

The rule of law that no person shall be permitted to deliver himself from contract obligations by saying that he did not read what he signed or accepted, is subject to this limitation, namely, that it is not to be applied in behalf of any person who by word or act has induced the omission to read. The defendant has brought to our notice a few of the many cases in which the rule has been plainly declared; but we think that in few or none of these did the party seeking to enforce it subject himself to this limitation.

There was in the first written draft agreed upon by the plaintiffs and defendant the contract between them; in all its terms and conditions it became, and has hitherto continued to be operative. The draft of another and variant one has not annulled or affected it, because the last has not in the eye of the law been accepted by or become obligatory upon the plaintiffs. That contract the defendant had the

right to rescind,—a right which it has possessed in its fullest measure because it was not affected by the delivery of the variant one, not accepted by the plaintiffs; and if, because of its own negligence in omitting to execute and deliver a true copy of the original agreement, it resulted that it was induced to refrain from exercising its right of rescission, it must accept the consequences rather than cast the burden upon the plaintiffs.

There is error in the judgment complained of, and it is reversed.

In this opinion the other judges concurred.