R. M. MERRIAM, Appellee, v. A. J. LEEPER et al., Appellants.

VENDOR AND PURCHASER: Refusal to Execute Note with Burdensome Provision. A purchaser of land who contracts, in a brief and undetailed way, to execute at a future date notes and mortgages, may legally refuse to execute notes and mortgages which contain burdensome provisions which are not *ordinarily* employed in closing such transactions, and which were *never* within the contemplation of the parties. So held where extraordinary provisions accelerating the maturity date were inserted in the papers.

MORTGAGES: Waiver of Accelerating Clause. A provision that a note and mortgage may be *instantly foreclosed* if the land be sold, is waived when the holder, with full knowledge of the sale, does not object thereto, and actively assists the buyer in securing a tenant.

REFORMATION OF INSTRUMENTS: Mutual Mistake When Instrument Signed Without Reading. A party who executes notes and mortgages without reading them, but in the full belief that they

have been prepared strictly in accord *with a prior contract, which provided for their execution and for the general terms thereof,* may have reformation, upon the basis of mutual mistake, upon later discovering that said notes and ·mortgages contain provisions which are highly prejudicial to him and inconsistent with the terms and fair implications of said prior contract. Mistake on the part of the *payee* may be inferred from the circumstances.

*Appeal from Delaware District Court.*—E. B. STILES, Judge.

NOVEMBER 22, 1921.

SUIT in equity, to foreclose three real estate mortgages amounting to a sum total of $46,000. These mortgages were executed on May 10, 1918, and drew interest from March 1, 1919, and purported to become due in seven years from March 1, 1919, with interest at 5 per cent. The plaintiff purported to declare the same due, by reason of certain accelerating provisions contained in the mortgages. The defendants pleaded that none of the mortgages sued on were due, for the following reasons: (1) That the alleged accelerating provisions of the mortgages upon which the plaintiff purported to declare the mortgages due had been waived by the plaintiff before bringing suit; (2) because such accelerating provisions had no proper place in the mortgages, and the defendants' signatures were obtained to such mortgages in such form by fraud and deceit of the·plaintiff and his assignor, in that the plaintiff's assignor had fraudulently concealed the same from the knowledge of the defendants at the time of the execution of the mortgages, and had by fraud and artifice induced the defendants not to read such provisions, whereby the defendants signed the mortgages without any knowledge of the presence of such provisions. These facts were set forth in a cross-bill, and a reformation of the mortgage was prayed. The decree of the trial court found a waiver on the part of plaintiff, and dismissed plaintiff's petition. It also dismissed the ·defendants' cross-bill, on the ground that fraud was not proved, and on the further ground that the defendants were negligent in having failed to read the mortgage. Both parties appeal. The defendants, having first perfected their appeal, are denominated the appellants.—*Affirmed in part; reversed in part.*

*Korf & Korf, Campbell & Campbell,* and *Carr & Carr,* for appellants.

*Bronson & Tierney,* for appellees.

EVANS, C. J.—I.  The mortgages in question were executed pursuant to a prior contract between the parties thereto, executed on April 20, 1918.  This prior contract was one of exchange of farms.  Leeper owned a farm of 200 acres in Polk County.  The plaintiff, Merriam, and one Mangold owned a farm of 400 acres in Delaware County, title to which was held by Mangold.  The negotiations of exchange were brought about by two real estate agents, namely, Zimmerman for Leeper, and McGregor for Mangold and Merriam.  The contract of exchange called for mutual deeds from the contracting parties to be delivered on or before June 1st following, subject to certain specified incumbrances.  The contract contained the following:

1. VENDOR AND PURCHASER: refusal to execute note with burdensome provision.

"The above said property last described subject to incumbrance to be given by A. J. Leeper and wife.  $26,000 on the ¼ section on which house is located.  $20,000 on the NE¼ without buildings.  $10,000 on the south 80 acres.

"The above incumbrances shall bear 5 per cent interest payable annually, due 7 years from March 1, 1919.  Interest from 3-1-19.

"All papers shall be executed and deeds passed on or before June 1, 1918, at the office of A. W. McGregor, Cedar Rapids, Iowa.

"Both parties to this contract shall retain possession of their respective leases until March 1, 1919, and shall pay taxes due January 1, 1919, on their present respective holdings."

On May 10, 1918, Leeper and wife executed notes and mortgages for $56,000, including those in suit.  These notes and mortgages purported in terms to run for seven years from March 1, 1919, at 5 per cent annual interest.  In fine print, however, the notes contained the following proviso:

"If said real estate or property shall be sold or title changed, this note becomes due.  A removal from Delaware County, Iowa, by the maker thereof shall cause this note to become due thereupon immediately."

The mortgages contained the following:

"If said premises be sold, shall cause the whole of said money to become due, and this mortgage may be foreclosed thereupon immediately."

These provisions in fine print were not discovered by Leeper at the time he executed the notes and mortgages, nor were they discovered until many months thereafter. On October 15, 1918, Leeper sold the 400-acre farm to the defendant Allfree. Some time between October, 1918, and March 1, 1919, Allfree negotiated with Merriam, who was in the real estate business in Delaware County, for a renter. A renter was found for him by Merriam, to whom Allfree rented the land for the year 1919. Merriam was at that time the holder of the notes and mortgages in suit by a transfer thereof from Mangold, which appears to have been made on June 4, 1918. At this time, and up to the fall of 1919, both Allfree and Leeper were still ignorant of these provisions now referred to. They gained their first information in that regard by a notice from Merriam to the effect that he had declared the notes and mortgages due.

As already indicated, the trial court found that the plaintiff had waived the provision, so far as the particular sale from Leeper to Allfree was concerned, but refused to reform the instruments for want of sufficient proof. The result is that, though the sale by Leeper to Allfree cannot further be made a ground for declaring the mortgages due, yet Allfree becomes bound to these provisions for the future, and is unable to sell his property without accelerating the due date of the mortgages. He is further subjected to the same peril because he is not a resident of Delaware County. Allfree and Leeper are both residents of Jasper County.

The evidence is undisputed that the provision of the contract for 5 per cent interest for a term of seven years is a very valuable one for the payor, and that mortgages for such a term and at such a rate could be replaced only at an expense of approximately $6,000. Where this loss, if any, should fall, as between Leeper and Allfree, is a question not litigated; but Allfree and Leeper join in the same defense and cross-bill, Leeper being personally liable on the notes as the maker thereof, and Allfree being liable thereon as having assumed the debt.

Upon the record before us, we have little trouble in affirming the decree below upon plaintiff's appeal.   The more important question, and perhaps the more difficult, arises upon the defendants' appeal from the dismissal of their cross-bill.   The burden was upon the defendants to show that Leeper signed the notes and mortgages in the form in which they were drawn, either under mutual mistake as to their contents or else as a result of fraud on the part of plaintiff's assignor.   We will assume at this point that the burden was also upon them to show that the fraud or artifice of the plaintiff's assignor was instrumental in preventing him from reading the instruments which he signed, or in inducing him not to read them.

2. MORTGAGES: waiver of accelerating clause.

The discussion of the question thus presented by the cross-bill divides itself quite naturally into two stages:

(1)   Was Leeper under legal obligation to sign these notes and mortgages in the form in which they were drawn at the time he signed them?   Could he, in legal right, in view of his antecedent contract, have refused to sign the notes and mortgages in the form in which they were presented to him?

(2)   Were the objectionable provisions included by *mutual* mistake?   Did the plaintiff's assignor use any artifice with fraudulent intent to prevent Leeper from reading the fine print in the instruments, or with intent to induce him not to do so?  If yea, was such artifice an efficient cause in so inducing Leeper to omit the reading of such provisions?

Turning to the first phase, we have already set forth the provisions of the antecedent contract as to the incumbrances which were to be executed by Leeper and his wife upon the 400-acre farm purchased by him.   The contract represented a meeting of the minds of the parties, and was an enforcible contract.   It did not deal in the details of the form of the incumbrances that were to be created.   The quoted provisions, however, implied that the incumbrances were to be put into appropriate form.   A court of equity might well find, in the enforcement of the contract, that it contemplated the execution of notes and mortgages in the ordinary and usual form necessary to carry out its fair implications.   If Leeper had discovered these objectionable provisions before he signed the papers, and if

thereupon he had refused to sign such instruments on account of the presence of these provisions, he could have justified himself in so refusing only on the ground that such provisions were not ordinary or usual in notes or mortgages, and that they were not fairly within the contemplation of the parties or within the implications of the contract. As regards the provision which required Leeper to continue his residence in Delaware County, he was not a resident of Delaware County, but was at that time a resident of Poweshiek County. He had no intention of ever becoming a resident of Delaware County, and plaintiff and his assignor undoubtedly so understood. The notes and mortgages were actually signed in the home of Leeper in Poweshiek County. This was his home when he signed the contract. Up to the time of signing the notes, he had breached no condition of the contract. When he signed the notes, however, he breached the condition as to residence in Delaware County as soon as it was made. This condition was imposed upon him, not by the contract, but by the notes. As to the condition declaring the notes due in the event of a sale of the land, this was contained in the mortgages. It was not contained in the "contract," unless for some reason it should be deemed implied therein. That such condition was not within the actual contemplation of the parties at the time the contract was entered into is made clear by the undisputed evidence. The sum total of the incumbrances was $56,000. This was divided into three parts, and put into three incumbrances. For the purpose of these mortgages, the farm was divided into three tracts, and one specified incumbrance was assigned to each tract. This was avowedly done for the very purpose of enabling Leeper to make a sale of each separate tract subject to its own incumbrance, without being hampered by having all the tracts covered by all the incumbrances. Moreover, he listed the farm for sale with the plaintiff's agent, McGregor. McGregor was the agent of plaintiff and Mangold, who on May 10th presented to Leeper the notes and mortgages now under consideration, and obtained his signature thereto.

Without pursuing this feature of the discussion further, we are very clear that the conditions thus included within the notes and the mortgages were not within the contemplation of

the contract and were not fairly implied therefrom, and that Leeper could, in legal right, under his antecedent contract, have declined to sign the notes and mortgages in the form in which they were presented. That is to say, these provisions were neither ordinary nor usual nor reasonable nor consistent with the manifest rights of Leeper under the antecedent contract.

II. This brings us to the second phase of the discussion. The dismissal of the cross-bill in the court below was based upon the finding that Leeper had not sufficiently excused his failure to read the notes and mortgages. It is a general rule in equity that a party to a written contract may not escape the obligations thereof by merely showing that he failed to read the same, and therefore failed to discover some of its provisions. He is held presumptively bound to read the contract which he signs, unless he can show adequate reason for failing in that regard. If he had the ability and opportunity to read the contract himself, it is not an adequate reason for failure to read that the other party purported to state the contents. He must show that he was in some manner prevented from reading the contract, and that the other party was, by some artifice or fraudulent connivance, instrumental in such prevention, or in inducing him to refrain from reading it. The reason and purpose of this rule are to afford adequate protection to the integrity of written contracts. It is not intended as a protection to the fraud of the other party, although its operation may sometimes result in such protection. If a written contract could be defeated by a party thereto after he had received its consideration, by a mere showing that he never read the contract and did not know its contents when he signed it, it would effectively destroy the value of written contracts to the business of the world. The other party has a right to rely upon the contract as written, when he parts with the consideration, and he should not be required to take the risk thereafter of an oral dispute as to what its contents ought to have been. This is subject to the rule that a charge of fraud or mutual mistake will always be inquired into, and when either is clearly proven, equity will grant relief. It is at least doubtful whether the rule here enunciated has any special application to the trans-

*3. REFORMATION OF INSTRUMENTS: mutual mistake when instrument signed without reading.*

action under consideration here. If this were a case where, on May 10, 1918, the mortgagee had loaned to the mortgagor $46,000, and had parted with his money upon the faith of the instruments actually signed, he would be in a position to say:

"I would not have parted with my money at all upon any different terms than those set forth in the instruments which were presented to Leeper to sign."

To award a reformation in such a case would be to leave the benefit of the consideration in the hands of Leeper, and yet to withdraw from the lender the provisions upon which he had insisted. True, if Leeper had read the mortgages and had discovered their provisions, he would have had the absolute right, in such a case, to refuse to execute them. The other party would have had an equal right to refuse to loan the money. For such reason, a court of equity would weigh the evidence with great caution, and would hold the complaining Leeper to a very strict burden of proof of fraud or mistake. Such is not the case before us. The minds of these parties had previously met, and their contract had been reduced to writing. Their mutual rights and liabilities were thereafter defined by such written contract. There is no claim of any mistake in such contract. There were no later negotiations looking to a new contract. The notes and mortgages in question were not mutually intended as an undertaking of new obligations. They were executed simply as convenient instruments of evidence, pursuant to the existing contract and obedient thereto. Neither party intended to incur any new liability or to waive any right acquired by such antecedent contract. Under such circumstances, the antecedent contract becomes and is the conclusive gauge by which to determine whether there was a departure therefrom or an addition thereto in the provisions of the notes and mortgages. The rule in such a case, as stated by Story in his Equity Jurisprudence, Vol. 1 (13th Ed.), Section 115, is:

"Where an instrument is drawn and executed which professes or is intended to carry into execution an agreement previously entered into, but which, by mistake of the draftsman either as to fact or to law, does not fulfill that intention, or violates it, equity will correct the mistake so as to produce a conformity to the instrument."

See, also, 2 Pomeroy on Equity Jurisprudence, Section 845; 24 American & English Encyclopedia of Law 652 *et seq*. *Palmer v. Hartford Fire Ins. Co.*, 54 Conn. 488 (9 Atl. 248), presents a case where an insurance company promised to issue a new insurance policy upon the same terms as an expiring one. The policy actually issued contained important variations which were not discovered by the policyholder, who failed to read his new policy because of the promise that it was to be identical in its terms with the old policy. He was awarded relief by reformation.

The case before us bears some analogy, also, to a case of substitution of a copy for a lost contract, where a mistake in the copy is later discovered. This was the case presented to us in *Christensen v. Harris*, 190 Iowa 256. In that case, the complaining party signed, without reading, an alleged substituted copy of the lost contract, on the representation of the other party that it was an exact copy. In such a case, even if the complaining party had read the alleged copy, she might not have been able to detect with certainty whether it was a correct copy or not. The mistake in such signed copy being later discovered, she was awarded relief by reformation.

In the case at bar, the rights of the parties were complete under the antecedent contract. Even though Leeper had failed and refused to sign any notes or mortgages at all, equity could have enforced the contract in favor of the creditor quite as effectively without the notes and mortgages as with them. True, it was competent for the parties to the antecedent contract to modify the same by subsequent negotiations, and such modification could properly have been included in the notes and mortgages. But there were no negotiations between the parties looking to any modification of the original contract. The payee purported to draw the notes and mortgages in strict conformity to the antecedent contract, and the payor signed them with no other purpose or intent than that they should conform to such antecedent contract. The antecedent contract was the satisfactory, if not the conclusive, evidence of the intent of the parties in the execution of the notes and mortgages. It being discovered later that the notes and mortgages contained provisions which were highly prejudicial to the payor, and inconsistent

with the terms and fair implications of the contract, and that their presence was unknown to the maker of the instruments at the time he signed the same, a prima-facie case of mutual mistake is presented, even though there be no direct evidence of mistake on the part of the payee. The mutual intentions of the parties being disclosed by the antecedent contract, and the inconsistent variance therefrom being disclosed by the notes and mortgages, a mistake by the payee may be properly inferred. Mutual mistake being shown, the parties stand on a parity on the question of negligence, and it is immaterial whether it resulted from the failure of one or both to read the contract.

It is our conclusion that the facts here considered constitute sufficient and satisfactory evidence of mutual mistake.

III.   There is another feature of the case which leads us to the same result. The business of obtaining the notes and mortgages was transacted for the payees by their agent, McGregor. He called unexpectedly upon Leeper at his farm home, very early in the morning, and intercepted Leeper while he was on his way to his field. Several circumstances were put in evidence by the defendants, tending to show artifice and a fraudulent purpose by McGregor to create a situation for Leeper which would induce him to forego the reading of the papers before signing the same. If it be assumed that McGregor was conscious of the variance between the papers which Leeper was about to sign and the antecedent contract, these circumstances were sufficient, in our judgment, to find fraud on his part, and that Leeper was thereby induced to forego the reading of the papers. That McGregor did know the contents of the papers which he himself had prepared and brought with him for Leeper's signature, could properly be inferred. Such inference could, of course, be negatived by testimony. The circumstances themselves could be explained. McGregor became a witness on behalf of the plaintiff, and testified that he himself *did not know* that the objectionable provisions were contained in the papers signed. No other material evidence was offered by the plaintiff to explain any circumstance or to rebut the inference of fraud therefrom. Accepting the testimony of McGregor as true, we may grant that it would exonerate him from the charge of fraud. On the other hand, it established indisputably the mutuality of the mistake.

Clearly, therefore, the objectionable provisions were included in the instruments by mere inadvertence, and by a failure of both parties to discover their presence. They were, in fact, buried in a mass of fine print, much of which could have no material bearing upon the particular rights of the parties to the instruments, and some of which were quite unintelligible. The instruments presented by McGregor to Leeper for his signature did contain one departure from the contract. This departure was specifically brought to the attention of Leeper by McGregor, and was assented to by Leeper. This departure was the separation of the incumbrance of $26,000 referred to in the antecedent contract into first and second mortgages of $20,000 and $6,000, respectively, upon the home quarter section. This modification was requested by McGregor, with the assurance that, in all other respects, the instruments were in strict conformity with the contract. This statement by McGregor, which we assume to have been made in good faith, was so accepted by Leeper, and became, in a considerable degree, responsible for the inadvertence of both in failing to discover any other departure from the antecedent contract.

In view of the state of the record as we have so far set it forth, we have no occasion to discuss the evidence bearing upon the question of fraud. It is our conclusion that the defendants are entitled to relief upon their cross-bill by reformation, on the ground of mutual mistake. The decree of the district court will, therefore, be affirmed on plaintiff's appeal, and will be reversed on the appeal of the defendants. Decree may be had in this court upon motion of either party. Otherwise, the case may be remanded for decree consistent herewith.—*Affirmed .in part; reversed in part.*

Weaver, Preston, and De Graff, JJ., concur.