## CROWELL v. NEW HAMPSHIRE FIRE INS. CO.*

### No. 4394.

Court of Appeal of Louisiana. Second Circuit.

April 28, 1933.

J. Norman Coon, of Monroe, for appellant.

Hardin & Coleman, of Shreveport, for appellee.

DREW, Judge.

Plaintiff is the owner of lot 11 of square 15 of Austin and Eby's First Southern addition to the town of West Monroe, La., which lot bears municipal number 208 Stewart street, in the city of West Monroe. Prior to June 17, 1929, she was also the owner of the adjoining lot, which bears municipal No. 210 Stewart street, in said city. On each lot there was a dwelling, both of which were insured against fire through the Breard Insur-

*Rehearing denied June 5, 1933.

ance Agency, which represented the defendant company, as well as other insurance companies.

Lot No. 208 was insured in the defendant company, and lot No. 210 in a different company. The policies, when issued, were delivered to the People's Homestead & Savings Association of Monroe, at the request of plaintiff, for safe-keeping. Through error, a loss payable clause was attached to the policy covering the building on lot 208, in favor of the People's Homestead & Savings Association. The policy was issued June 17, 1929, insuring the property until June 17, 1930.

At the time of the issuance of the insurance, the People's Homestead & Savings Association did not hold a mortgage against this property, to wit, lot 208. The same Breard Insurance Agency carried the insurance on other property owned by plaintiff, and at its convenience would bill plaintiff for the premiums, which were always promptly paid on receipt of the bills. All policies written covering her property were sent to the People's Homestead & Savings Association at her request for safe-keeping. No one of the policies written by the said insurance agency for plaintiff was ever sent to her; in fact, she never saw the policies, although she could have seen them if she had cared to do so. The People's Homestead & Savings Association was not her agent with any authority to act for her in regard to the policies. The policies were left there for safe-keeping only. The Breard Insurance Agency wrote all the insurance for plaintiff, and there was, if not express, an implied, mutual agreement that it was to keep the property insured. When one policy was about to expire, according to its terms, another would be written to take its place—the usual and customary mode of handling fire insurance by a reputable insurance agency when dealing with a reputable client or customer.

We do not intend to say that the Breard Insurance Agency would have been liable if it had failed to keep the property insured, but it is very clear from the testimony of Mr. Breard that he did intend to keep the property insured, and he issued other policies to plaintiff renewing those about to expire, without any further request or application from her; that some time after issuing the renewal policies he would send his bill and then receive payment for the premiums.

During the time the policy issued June 17, 1929, bearing No. 47012, was in effect, plaintiff sold lot No. 210 to one D. H. Strength. This was in the latter part of 1929. The policy of insurance covering the dwelling on said lot 210 correctly bore the mortgage or loss payable clause, in favor of the People's Homestead & Savings Association. On the day of the sale, or the day after, the People's Homestead & Savings Association, through one of its employees, by telephone, notified the Breard Insurance Agency to change the beneficiary in the policy covering the dwellings on both lots 208 and 210, from plaintiff to D. H. Strength. There was no such notice or request from plaintiff. The Breard Insurance Agency, acting on this request, made the changes, as requested. Plaintiff had no knowledge that the change had been made as to lot 208. About the time of the sale from plaintiff to Strength of lot 210, plaintiff's husband told the insurance agency to make the change as to lot 210, but did not request any change as to lot 208.

Plaintiff had been billed by the insurance agency for premiums covering policies on lots 208 and 210 for the period beginning June 17, 1929, and ending June 17, 1930, and she promptly paid same, as she did the premiums on other property on which insurance had been issued by the said insurance agency. What transpired in regard to the insurance on both lots 208 and 210 from the time of the issuance of the two policies in 1929 up until the fire is fully stated in the testimony of Mr. Breard, of the Breard Insurance Agency. We will quote his testimony:

"Q. State the circumstances under which the first policy that is referred to in this was issued? A. Mr. Crowell came to the office and instructed me to insure the two pieces of property—208 and 210 Stewart Avenue—if I am not mistaken 210 had a mortgage on it and 208 didn't. At the time it was issued in the name of Mrs. Olivia Warner Crowell, with instructions to deliver the policies to the People's H. & S. Association. Later either Mrs. Crowell or Mr. Crowell paid the premium on these two policies. Along in the latter part of 1929, I don't know exactly the date, I was instructed by the Building & Loan to make a transfer of this property to D. H. Strength, with the mortgage clause in their favor.

"By the Court: What property are you talking about?

"Witness: 208 and 210.

"By the Court: Both of them? A. Both of them. They called the policy numbers out to me with instructions they be transferred. I transferred—made transfers and delivered the instruments to the Building & Loan. In 1930, when the policies expired both policies were renewed in the name of D. H. Strength. A short time after the policies were issued, the premiums were not paid and I made demand on the People's H. & S. Association, as mortgagee under the policies, for the premiums and they paid them. All during that time I didn't have any knowledge of Mrs. Crowell having any interest in it—from the latter part of 1929 up to the fire in 1931. The policies were renewed in the name of D. H. Strength, and I was letting those premiums run as an open account. We go to the Building & Loan every month or sixty days or

764

ninety days afterwards and make clearance of all past due premiums held by them as security. The fire occurred, therefore I didn't make any demand. They paid the 1931 premium for D. H. Strength. But under the policy on 208 I didn't make demand for that premium. I figured it was not old enough with the Building & Loan. As I say, during all the time from 1929, the time of the transfer, up to the time of the fire I had no knowledge of Mrs. Crowell having any interest in the property.

"Q. From December 23, 1929, the date of your endorsement on policy 4712, the first of the three policies referred to in this suit— from that time did you know Mrs. Crowell, the plaintiff in this suit, as having any relations with the defendant company relative to any interest on 208 Stewart Avenue? A. No, sir.

"Q. Did you intend, on that date, to transfer the contract of insurance to D. H. Strength? A. What is that?

"Q. Did you intend, as representing the New Hampshire Insurance Company, to transfer the contract of insurance to D. H. Strength? A. Yes, sir. At the request of the Building & Loan.

"Q. At the request of the Building & Loan? A. Yes, sir.

"Q. When a new policy was issued the following year on that same property, in the name of D. H. Strength, did you, representing the defendant company in this case, intend to contract with Mr. D. H. Strength for fire insurance on No. 208 Stewart Avenue? A. Yes, sir.

"Q. And when the second policy expired and the third policy was issued, as referred to in the suit, did you intend, representing the defendant company, to contract with Mr. D. H. Strength for that insurance? A. Yes, sir. * * *

"Q. In each one of these three policies, from the date of assignment on the first policy, with whom did you intend to contract for insurance covering the property at No. 208 Stewart Avenue? A. From the time of the first transfer?

"Q. Yes, sir. A. Mr. D. H. Strength.

"Q. From the date of that endorsement on the first policy to whom did you look for the payment of premiums on these policies? A. Well, I didn't even know Mr. Strength. The policies were mailed out and I have never collected a premium from Mr. Strength. Mrs. Crowell paid the first premium and the People's H. & S. Association the balance, so far as the premiums are concerned.

"Q. State whether or not that is customary in reference to insurance policies, where the Homestead Associations in Monroe are the mortgagee? A. Yes, sir, the usual custom as long as I been in the business. They look after transfers where they have a mortgage on it.

"Q. What is the custom with reference to the payment of the premium? A. The Building & Loan assumes that obligation when the premium is not paid by the assured in a reasonable time.

"Q. From the date of that transfer, that endorsement on the first policy, why did you from that time on not deal with Mrs. Crowell for insurance on No. 208 Stewart Avenue? A. I didn't figure Mrs. Crowell owned the property any longer. Had no knowledge of her having any interest in it.

"Q. Mr. Breard, at the time of this endorsement on the first policy, December 27, 1929, did Mr. Crowell advise you of any change in ownership and of transfer of this policy? A. I don't have any recollection of Mr. Crowell seeing me about it. It's possible that he could have.

"Q. But you made the transfer at the request of the Building & Loan Association? A. Yes, sir.

"Q. Subsequent to that time did you see Mrs. Crowell with reference to other insurance? A. I saw Mrs. Crowell each year. I put the insurance on her house on 3rd Street, I believe it is, and her furniture. I made several calls there, and I held a little conversation, not pertaining to business but talking about everything in general, in collecting the premium. ·

"Q. Did she ever speak to you, or you ever speak to her, with reference to the insurance on No. 208 Stewart Avenue, in West Monroe? A. No, sir."

Each of the policies issued on lot No. 208 carried a mortgage loss payable clause in favor of the People's Homestead & Savings Association, through error. The last mortgage held by said Homestead & Savings Association on lot No. 208 was in 1924, five years prior to the issuance of the first policy.

On July 29, 1931, the dwelling located on lot 208 was destroyed or damaged by fire to an extent admitted to be $816.92, an amount admitted to be within the limits of the liability of the policy, if there is liability under the policy. Immediately after the fire, plaintiff called upon the Breard Insurance Agency for settlement under the policy of insurance she claimed to be in effect, and was informed that she had no insurance covering this property, that the insurance covering the property was in the name of D. H. Strength. Plaintiff then filed this suit asking for reformation of the policy to make it comply with the original policy issued to her, to wit, No. 4712, issued June 17, 1929, alleging a mutual mistake, and praying for judgment for the amount of damage caused by the fire.

The defenses set up are, in short: (1) No mutual mistake; (2) each policy is a separate

contract; (3) no premiums were paid by plaintiff; and (4) negligence and laches.

The lower court rejected the demands of plaintiff, and she has appealed to this court. The opinion of the lower court was oral, and we have not the benefit of his reasoning and do not know which defense was sustained. It appears that there is no case exactly in point that has been decided in any of the jurisdictions of this country. However, there are many cases that are analogous, and we have been greatly assisted in determining the issues involved herein by the able briefs furnished us by counsel for both plaintiff and defendant. In passing, we might say it is a pleasure to work on any case when the lawyers show an inclination to assist us by devoting some of their time to a study of the issues involved, and present to us in brief form the result of their efforts.

There is really no dispute as to the facts in this case, and correct deductions from the facts are as follows:

Plaintiff is the owner of lot No. 208; it being her separate paraphernal property. On June 17, 1929, the dwelling located thereon was insured by defendant, through its agent, the Breard Insurance Agency, with plaintiff as beneficiary of said policy; that with her knowledge or consent, in the latter part of the year 1929, the Breard Insurance Agency changed the beneficiary under said policy from plaintiff to D. H. Strength, and, at the expiration of the term of the policy of insurance, it was renewed in favor of D. H. Strength, without the application of any one, and at the expiration of that year it was again renewed in favor of Strength, without any new application; that the dwelling located on lot No. 208 was destroyed during the existence of this last policy. The premium on the policy issued June 17, 1929, was paid by plaintiff; on the policy for the next year, it was paid by the People's Homestead & Savings Association, and the policy in existence at the time of the fire had not been paid for, but was charged to D. H. Strength, and the insurance agency was looking to the People's Homestead & Savings Association for its payment, but had not presented a bill to any one.

The policy on the dwelling on lot No. 210 was changed correctly to D. H. Strength at the time the error was made in changing the policy on 208 from plaintiff to D. H. Strength. The policy on lot 210 had been renewed twice and was in effect at the time of the fire, and all premiums had been paid by the People's Homestead & Savings Association.

D. H. Strength nor the People's Homestead & Savings Association had any mortgage interest or otherwise in lot No. 208, although there had been attached erroneously a mortgage loss payable clause in favor of the Homestead & Savings Association. Plaintiff had never seen any of the policies covering the improvements on either 208 or 210. She believed the dwelling on lot 208 was insured in her favor at the time of the fire, and defendant intended to insure the dwelling on lot 208 and did insure it, the insurance being in effect at the time, if the property had been owned by D. H. Strength. When each of the renewal policies was issued, insurer was attempting to insure the dwelling located on lot No. 208 in the name of the rightful owner, and the only reason the insurance was not issued in the name of the rightful owner was because of the error committed by the insurer in changing the beneficiary from the rightful owner to D. H. Strength, on the advice of the People's Homestead & Savings Association, who were without authority to request this change. It could not be doubted that, if the dwelling had been damaged by fire during the existence of the first policy and after the change of beneficiary from plaintiff to D. H. Strength, plaintiff could have recovered under the policy. To hold otherwise would be to hold that an insurance agency, at the request of any outsider, could destroy any one's insurance on his property without his knowledge or consent.

The insurer insured the very property intended to be insured. It received the premiums for two years upon presenting its bills, and had extended credit for the last period. It could have received payment of this premium at any time its bill had been presented. D. H. Strength was at no time known in the transaction other than the insurer erroneously thought him to be the owner. He made no application at any time for insurance, and never paid any premium.

A parallel situation would have arisen if the insurer had issued only one policy in favor of D. H. Strength and, through error, insured lot No. 208 instead of No. 210, which was not owned by Strength, and then the dwelling on lot No. 210, owned by Strength, had burned. Strength certainly, under such conditions, could have recovered, for the intention would have been clear that the error was in the location of the property and the intention to insure his property, and this alone would have governed. Hayes v. Netherlands Ins. Co. of The Hague, Holland, 10 La. App. 612, 120 So. 218.

Or, if that situation had prevailed and the fire occurred on lot No. 208, the insurer could have successfully resisted this plaintiff's claim by showing they had only intended to insure the property at 210, and not on lot 208. However, when both lots were continually insured, the intention is plainly shown that the insurer intended to insure the dwellings on both properties.

■ The original policy was issued by defendant through its agency, in accordance with both parties' agreement. There was a meeting of minds, and defendant accepted the risk on the dwelling on lot 208. The

error arose when the defendant's agent, without authority from either the assured or the defendant, attempted to tamper with their contract by changing the name of the assured and substituting that of another. Neither the assured nor the insurer knew of this mistake or that the error had been committed. The very existence of the contract was attempted to be changed through error without the knowledge of either the insurer or the insured. When the name of the assured was changed in the original policy, it was done in error, and, when the policy was delivered to the People's Homestead & Savings Association, at plaintiff's request, it was for all purposes received by her. She did not examine it; therefore she received it in error. It was a mutual mistake. Brodie v. Atlas Assurance Co., 158 La. 695, 104 So. 620; Pope-Gammill Lbr. Co. v. Zurich Gen. A. & L. Ins. Co., 168 La. 422, 122 So. 278; Hardin Bag Co. v. Milwaukee Mech. Ins. Co., 160 La. 439, 107 So. 298.

In Gaudet v. North River Insurance Company, 156 La. 719, 101 So. 118, the court said: "An insurance policy which is not in accord with the contract which it purports to evidence, will be reformed by equity so as to conform to parties' intention."

Another case more nearly in point is the Great American Insurance Company v. Johnson (C. C. A.) 25 F.(2d) 847. In that case the court held issuance and delivery of fire policy, insuring corporation occupying insured building, instead of owners thereof, pursuant to erroneous information given by employee of corporation to agent to whom owner applied for policy, held result of mutual mistake, entitling owners in equity to reformation of policy and decree enforcing it as reformed.

In the Pope-Gammill Case, supra, the court said:

"It is conceded that:

" 'An insurance policy, which is not in accord with the contract which it purports to evidence, will be reformed by equity so as to conform to parties' intention.' Gaudet v. North River Ins. Co., 156 La. 179, 101 So. 118.

"It was stated in the foregoing case, in line with Davega v. Crescent Mut. Ins. Co., 7 La. Ann. 229, that in order for the court to reform an insurance contract, there must have been either mutual mistake or mistake on one side and fraud on the other.

"The ruling in the two cases was approved in Hardin Bag Co. v. Milwaukee Mech. Ins. Co., 160 La. 439, 107 So. 298. Also in Brodie v. Atlas Assur. Co., 158 La. 695, 104 So. 620.

" 'And it is said in Corpus Juris, vol. 26, p. 104, that in a proper case shown a court of equity 'will reform a written contract of insurance on the ground of accident, fraud or mistake. Such mistake, among others, may be one in reference to the amount of insur-

ance; the term and duration of the risk; the property or interest covered by the policy; or the name of the person insured and the ownership of the property.' "

In Corpus Juris, vol. 26, p. 103, we find the following statement of law: "The rules as to reformation of written instruments apply to fire insurance policies. A court of equity on a proper case shown will reform a written contract of insurance on the ground of accident, fraud or mistake. Such mistake, among others, may be one in reference to the amount of insurance, the term and duration of the risk; the property or interest covered by the policy; or the name of the person insured and the ownership of the property, although reformation will be denied when the misstatement as to the ownership was due to misrepresentation or concealment on the part of insured, even if he acted in good faith."

And in the case of Davega & Co. v. Crescent Mutual Ins. Co. of New Orleans, 7 La. Ann. 228, the court said: "We do not doubt that a policy of insurance may be reformed, where it is demonstrated, by legal and exact evidence, that there has been a mistake in filling it up, which has violated the understanding of both parties."

Defendant next contends that, when June 17, 1930, came, the original policy expired, and the defendant made a different contract. The first policy allowed occupancy by tenant: the second policy, issued in the name of D. H. Strength, allowed only owner occupancy; and, when this policy expired June 17, 1931, a new and different contract was entered into allowing only owner occupancy and providing a change as to safe flue clause. However, there is no contention that the "safe flue clause" was not complied with. It is only urged to show the difference in the contracts of insurance. Be that as it may, we must reckon back to the fact that the original erroneous idea was in the mind of the insurance agent that plaintiff no longer owned the property and that the owner was D. H. Strength. The two renewal contracts were not issued on application of D. H. Strength or the People's Homestead & Savings Association, but were issued on the original application of plaintiff, or through the custom of the insurance agency. The two new contracts or renewals were issued and forwarded to the Homestead & Savings Association just as the first one was. Plaintiff did not read any of the three.

■ When the insurance agency issued the contract on June 17, 1930, it was legally bound to issue a policy containing the same terms and conditions as the original policy. By the renewal or extension, unless there is a special agreement for different terms, the original policy is continued under the original stipulations, and the only change is in the time of its expiration. Under such circumstances, if there is a change in the conditions

or terms of the policy, it is the duty of the insurer to call attention to the change, otherwise the change can be no part of the contract, and the renewal contract is subject to reformation by the courts of equity to make it conform to the original contract, unless there has been an amendment of the contract by enactment of a statute by the Legislature. See Cyclopedia of Insurance, Couch, vol. 6, §§ 1363, 1370; Corpus Juris, vol. 32, p. 1144, note 62; Ruling Case Law, vol. 14, § 116, p. 943; Liverpool & London & Globe Ins. Co. v. Hinton, 116 Miss. 754, 77 So. 652.

 Had defendant not been in error as to the owner of lot 208, there would have been no change in the right of tenant occupancy. The failure of plaintiff to read the contracts of insurance does not relieve the insurer. She had the right to presume that the policies were issued in accordance with the original policy, until expressly notified to the contrary. General Finance Co. v. Universal Automobile Ins. Co., 19 La. App. 333, 139 So. 48; Joyce on Insurance, vol. 1, p. 267; Palmer v. Hartford Fire Ins. Co., 54 Conn. 488, 9 A. 248.

The next defense on payment of premiums has been heretofore discussed. The Homestead & Savings Association paid the second premium, and the third and last premium had not been paid because no bill had been presented for same. A tender of the last premium was made by plaintiff after the fire, and was refused by defendant's agent. The Homestead & Savings Association accepted from plaintiff the amount they had erroneously paid for her. The policy had never been canceled, and was in full force and effect at the time of the fire. The premium was erroneously charged to D. H. Strength, as was the name of the beneficiary in the policy. It is immaterial as to who paid the premiums, so long as they were paid. Revised Civil Code, art. 2134; Cyclopedia of Insurance, Couch, vol. 3, § 606, p. 1962; Kunes v. Sov. Camp, W. O. W., 110 Neb. 338, 193 N. W. 735; Knights of Maccabees of the World v. Patton, 179 Ky. 410, 200 S. W. 614.

The plea of laches is without merit, as we have held that the failure to read the policies did not relieve the insurer from its legal duty. Plaintiff did not discover the mistake until the morning after the fire and she immediately attempted to collect under the policy. The mistake was made in the latter part of 1929, when D. H. Strength's name was substituted for that of plaintiff in the first policy. That mistake remained unknown to both the insurer and plaintiff until the day after the dwelling on lot 208 was destroyed by fire. Plaintiff believed her house was insured, and defendant erroneously believed the house to be the property of D. H. Strength. The house was insured, and plaintiff is entitled to have the contract of insurance in ef-

fect on the house at that time reformed so as to make her the beneficiary thereunder, as originally issued on June 17, 1929, and all other conditions as to occupancy, to likewise conform to the contract of insurance as of date June 17, 1929, and she is therefore entitled to judgment for the damage by fire caused to her dwelling located on lot 208 during the existence of the last issued policy thereon.

Plaintiff has prayed for 12 per cent., as damages, and for reasonable attorney's fees. The courts no longer have any discretion in this matter; where liability is denied and recovery had, it is mandatory on the court to allow them. Brooks v. Liverpool & London & Globe Ins. Co. (La. App.) 144 So. 788; Isaac Bell, Inc., v. Security Ins. Co., 175 La. 599, 143 So. 705.

In cases of this kind, there is no necessity for proof to be offered as to the value of the services of an attorney. The court can best fix the fees. Brent v. La. State Life Ins. Co., 7 La. App. 99; Brooks v. Liverpool & London & Globe Ins. Co. (La. App.) 144 So. 788; Sigrest v. Fed. Ins. Co., 14 La. App. 55, 129 So. 379; Hunt v. Hill, 138 La. 583, 70 So. 522; Dorsey v. His Creditors, 5 Mart. (N. S.) 399.

In a similar case, recently decided by this court, viz., Brooks v. Liverpool & London & Globe Insurance Company, supra, we allowed 20 per cent. attorney's fees, and believe a like fee is just in this case.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be reversed; and that there now be judgment in favor of plaintiff and against defendant in the full sum of $816.92, with legal interest thereon from judicial demand until paid, and 12 per cent. upon both principal and interest as damages, and 20 per cent. upon principal, interest, and penalties, as attorney's fees; and for all costs.