# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 05-336


**FIREMAN'S FUND INSURANCE COMPANY**

**VERSUS**

**BULLIARD FARM, INC.**

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 02-65107
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Marc T. Amy, Judges.

**AFFIRMED.**

**Richard L. Crawford**
**Newman, Mathis, Brady, & Spedale**
**3301 North Boulevard**
**Baton Rouge, LA   70806**
**(225) 343-3456**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Fireman's Fund Insurance Company**

**Keith E. Thibodeaux**
**422 South Main Street**
**St. Martinville, LA   70582**
**(337) 394-3034**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Bulliard Farm, Inc.**

AMY, Judge.

The plaintiff, a crop insurer, brought suit against the defendant farming operation for non-payment of a crop insurance premium for the year of 2000. The defendant filed a reconventional demand, alleging that although he had requested crop revenue coverage from his insurance agent, the insurer had issued a policy providing a lower level of coverage. The trial court found that a mutual mistake had existed between the farm operator and insurance agent, and reformed the policy to provide crop revenue coverage. For the following reasons, we affirm.

### Factual and Procedural Background

James D. Bulliard testified that he has owned Bulliard Farm, Inc. ("Bulliard Farm"), the defendant herein,[1] and grown rice thereon for approximately eight or nine years. He stated that in 1999 he was contacted by Mr. Glenn Daigle, an agent with Buller's Insurance Agency of Bunkie, Louisiana. Mr. Bulliard explained that he purchased an insurance policy through Buller's Insurance Agency which would cover crop damage due to listed natural causes, and that also contained a clause that would provide Crop Revenue Coverage ("CRC"), which provides a guaranteed harvest price per acre for a covered crop. Mr. Bulliard stated that in late January 2000, he spoke with Stanley Buller, a different agent from Buller's Insurance Agency, and informed him that he would like to purchase a CRC policy again for his next harvest. Mr. Bulliard testified that the agent forwarded him a price quote for the new policy, which he stated that he signed and sent back to the agent in February 2000. Mr. Bulliard testified that a few months later he received an insurance policy, which had been issued by Fireman's Fund Insurance Company ("Fireman's Fund"), and began the year's farming operations.

---

[1] Mr. Bulliard testified that he owns and runs Bulliard Farm and is the sole shareholder and president of Bulliard Farm, Inc.

However, after beginning to harvest the rice, he reported to his agent that he believed he may have a claim for the difference between the amount he thought he would receive for his rice and the guaranteed harvest price. Mr. Bulliard stated that he was then informed that he had not procured a CRC policy, but instead was only insured under a Multiple Peril Crop Insurance ("MPCI") policy, which would cover certain named perils only, such as flood, drought, or excess moisture. Mr. Bulliard asserts that because he never received the difference between the amount he finally sold his rice for and the guaranteed harvest price, he never paid the premium price for the MPCI policy.[2]

Fireman's Fund subsequently filed suit to recover the $6,949 premium payment. Bulliard Farm, in turn, filed a reconventional demand, seeking to recover the guaranteed harvest price under the alleged CRC policy and damages. Following a trial on the matter, the trial court found that there had been a mutual mistake when Mr. Bulliard ordered the 2000 insurance policy, and reformed the MPCI policy to a CRC policy. Mr. Bulliard was awarded $25,749.78 in damages.[3] The trial court also

---

[2] It appears from the record that the standard crop insurance payment method for Bulliard Farm was to order the insurance early in the calendar year, usually in February, and then plant the rice and/or soybeans in the spring and sell the harvest in autumn, usually in September. After the crop had been sold, the insurance premium would then be paid from the proceeds. Where there was a CRC policy, as in 1999, Mr. Bulliard stated that the insurance company would simply deduct the amount due for the premium from the amount paid out for the guaranteed harvest price and forward the farmer the difference.

[3] In its reasons for judgment, the trial court described its method for determining the proper damage amount, stating:

> Bulliard Farm, Inc. has also pleaded [in its reconventional demand] compensation under Civil Code Article 1893. The compensation would be set off against any sums owed by Bulliard Farm, Inc. to Fireman's Fund Insurance Company. Under the reformed insurance policy Bulliard Farm, Inc. would owe to Fireman's Fund Insurance Company the quoted insurance premium for the CRC policy totaling $14,073.48. Fireman's Fund Insurance Company would owe in damages under the insurance policy for the rice crop for 2000 to Bulliard Farm, Inc. the amount of $39,823.23. When compensation is applied the net amount owed by Fireman's Fund Insurance Company to Bulliard Farm, Inc. is $25,749.78. By the application of compensation to this is the net amount due to Bulliard Farm, Inc. by

2

dismissed Fireman's Fund's claims against Bulliard Farm and ordered the insurance company to notify certain government entities that Bulliard Farm was not delinquent in its payment of the premium. Fireman's Fund now appeals, asserting the following assignments of error:

> 1. The Trial Court committed error by reforming the insurance contract for the year 2000.

> 2. The Trial Court committed error by admitting defendant's exhibit 6 as a business record hearsay exception.

## Discussion

*Reformation of Insurance Contract*

For its first assignment of error, Fireman's Fund asserts that the trial court erred in reforming the crop insurance contract for 2000 from providing MPCI coverage to CRC coverage.

A contract may be reformed as an equitable remedy, in order to correct mistakes in a written instrument due to fraud or error and to conform the instrument to the original intent of the parties. *Capedeville v. White's Temple of Church of God in Christ*, 99-1040 (La.App. 3 Cir. 12/22/99), 755 So.2d 923; *Tate v. Charles Aguillard Ins. & Real Estate*, 494 So.2d 1240 (La.App. 3 Cir. 1986). The burden is on the party seeking reformation to establish, by clear and convincing evidence, that a mutual mistake has occurred. *Farmers-Merch. Bank v. St. Katherine Ins.*, 96-1138 (La.App. 3 Cir. 4/30/97), 693 So.2d 876, *writ denied*, 97-1867 (La. 10/31/97), 703 So.2d 25.

---

Fireman's Fund Insurance Company. Through compensation Fireman's Fund Insurance Company has already been compensated by the deductions hereinabove and it is entitled to zero funds from Bulliard Farm, Inc.

A mutual mistake is a mistake shared by both parties to the instrument at the time of reducing their agreement to writing, and the mistake is mutual if the contract has been written in terms which violate the understanding of both parties; that is, if it appears that both have done what neither intended. The evidence of mutuality must relate to the time of the execution of the instrument and show that the parties then intended to say one thing and by mistake expressed another and different thing.

*Teche Realty & Inv. v. Morrow*, 95-1473, p.4 (La.App. 3 Cir. 4/17/96), 673 So.2d 1145, 1147 (quoting *Succession of Jones v. Jones*, 486 So.2d 1124, 1127 (La.App. 2 Cir.), *writ denied*, 489 So.2d 249 (La.1986)). This court has stated that a trial court's determination of the presence or absence of mutual error is a question of fact that should not be disturbed on appeal unless it is clearly wrong. *Id.*

In the instant matter, the trial court found that there was mutual error because Mr. Bulliard and the insurance agent both thought that they had actually agreed to a CRC policy. However, Fireman's Fund argues that any error was unilaterally made by Bulliard Farm, pointing out in its appellate brief that Mr. Bulliard "signed the application clearly showing he did not have crop revenue coverage." The trial court discussed the insurance application in its detailed reasons for judgment, which reviewed the testimony provided by the two witnesses at trial. The trial court stated:

> The undisputed testimony at trial was given by James Bulliard of Bulliard Farm, Inc. His testimony is credible and uncontroverted. Mr. Bulliard testified that in 1999 he obtained crop insurance from Buller's Insurance Agency. That crop insurance was given through a CRC crop loss policy. In 1999 Mr. Bulliard discussed with Mr. Daigle of Buller's Insurance Agency the desire for and issuance of the CRC insurance policy. After the crop in 1999, Bulliard Farm, Inc. was paid for the losses under the policy.
>
> In January of 2000 Mr. Bulliard contacted Buller's Insurance Agency again for issuance of similar insurance for the crop year of 2000. On that occasion he talked with a Mr. Stanley of Buller's Insurance Agency. Mr. Stanley advised Mr. Bulliard that there were two different policies that could be issued for the 2000 crop year. Those policies were a CRC policy or a MPCI policy. Stanley advised Mr.

4

Bulliard that he would send him quotations for the two policies in the mail. Mr. Bulliard received those quotations and they are introduced in evidence as Defendant's Exhibit 1. The first page of the exhibit is for CRC insurance at $249.28 per bushel. The second and third page of the quotation is for issuance of a MPCI insurance policy. Subsequently, Mr. Bulliard called Stanley at Buller's Insurance Agency and advised Stanley that he wanted for the 2000 crop the CRC insurance policy as per the quote forwarded to him in the mail by Buller's Insurance Agency. Stanley told him that he would fill out the application and mail it to him to give CRC insurance in 2000 the same as in 1999. Subsequently, Mr. Bulliard received the crop insurance application for the year 2000 from Stanley. This application is in evidence as Plaintiff's Exhibit 1. Bulliard testified that he did not review the application and did not observe that the type of policy checked on the application by Stanley was a MPCI policy rather than a CRC policy. Bulliard signed the application and returned it to Stanley at Buller's Insurance Agency. Subsequently, Bulliard received from Buller's Insurance Agency a notification that his policy for the year 2000 was enclosed and it provided for rice at 80 percent and soybean CRC 50 percent. Also attached to that document was the original insurance policy for the year 2000. Bulliard testified that he assumed that the insurance policy was a CRC policy for 80 percent for rice. The policy contained the same policy number as his 1999 crop insurance. That policy number is 328874. That same policy number is reflected in Plaintiff's Exhibit 1 which is the application for the 2000 insurance together with Plaintiff's Exhibit 2, which is the eventual bill from Fireman's Fund showing the policy number for 2000 being 328874. Defendant's Exhibit 2 which is the payment of loss by Fireman's Fund to Bulliard Farm, Inc. for the 1999 crop also shows the same policy number of 328874. Mr. Bulliard asserted that all of this reinforced to him that he had the same policy that he had in 1999 and that it was a CRC policy.

Bulliard testified that he called the Buller's Insurance Agency and talked to Stanley, the agent, in October of 2000. At that time Bulliard Farm, Inc. had harvested its rice crop for the year 2000. Bulliard told Stanley that he had a claim for the year 2000 under his crop insurance. At that time Stanley told him that Bulliard had a CRC policy. Stanley went to get the policy out of the file. After reading the policy from the file, Stanley told Bulliard that he had a MPCI policy and not a CRC policy. Buller's Insurance Agency on June 29, 2000, forwarded to Bulliard Farm the acreage report for the 2000 year rice acreage produced by Bulliard Farm, Inc. See: Defendant's Exhibit 7.

Bulliard testified that he first knew that he had a problem with the insurance when he talked to Stanley in October of 2000. At that time he told Stanley he had a claim for the 2000 crop. After the October 2000 conversation with Stanley in which Stanley changed what he said was

the type of policy that Bulliard had, despite Bulliard continuing to call the agency, Stanley would never talk to him again.

Bulliard testified that he did not receive the bill for the 2000 crop insurance from Fireman's Fund until January of 2001. He testified that he did not pay the bill because Buller's Insurance Agency obtained MPCI insurance instead of CRC insurance as requested by Bulliard.

It is obvious to this Court that there was a mutual error in the application for the 2000 insurance and the issuance of the 2000 insurance by Fireman's Fund. Bulliard testified that he requested CRC insurance from Stanley at Buller's Insurance Agency for the year 2000. Bulliard also testified that he did not see on the crop insurance application for the year 2000 that he was applying for MPCI insurance as filled out by Stanley. Obviously Stanley also thought that Bulliard Farms, Inc. had CRC insurance because when Stanley conversed with Bulliard in October at first he told Bulliard that he had a CRC policy until Stanley looked at the file and then said no you have a MPCI policy. Obviously both Stanley and Bulliard thought that a CRC policy would be issued for the year 2000.

Allum [sic] Peterson, who is the government program administrator for Fireman's Fund Insurance Company from the state of Kansas, testified at trial. He testified that Fireman's Fund Insurance Company issued an MPCI policy based upon the application received from Buller's Insurance Agency.

Mr. Peterson also affirmed that Buller's Insurance Agency was the agent of Fireman's Fund in the year 1999 and the year 2000. In applying for the insurance for Bulliard Farm, Inc., Buller's Insurance Agency was the agent of Fireman's Fund according to Allum [sic] Peterson the representative of Fireman's Fund.

Mr. Peterson also verified that the policy number for the year 1999 and 2000 crops was the same being Policy No. 328874. Mr. Peterson also testified that a CRC policy could have been issued by Fireman's Fund to Bulliard Farm, Inc. for the year 2000.

Mr. Bulliard testified that he did not completely review the application which had been filled out by Buller's Insurance Agency (Plaintiff's Exhibit 1) and did not notice on the application that Buller's had filled out the application for MPCI insurance instead of CRC insurance. Similarly, Bulliard testified that he did not review the insurance policy when he received it to determine whether a CRC policy had been issued. The courts have held that the failure to read applications and insurance policies does not relieve the insurer from its legal duty to issue the type of policy requested by the insured. See: Crowell v. New Hampshire Fire Insurance Company, 147 So. 762 (2 Cir. 1933).

The record supports the trial court's summarization of the witnesses' testimony as it appears in the record. The trial court was free to accept Mr. Bulliard's testimony, which it referred to as credible. Based on his undisputed description of the transaction, the trial court determined that there was a mutual error between Mr. Bulliard and Mr. Buller regarding the purchase of the 2000 crop insurance. Our review of the record reveals support for this determination. The record also contains Mr. Bulliard's testimony that he requested CRC coverage and stated that he would pay the added expense for the increased coverage that he had purchased the prior year. Although Fireman's Fund points to the marked box for MPCI coverage on the insurance application, the application also bears the same policy number as Bulliard Farm had been issued for the prior year, which is consistent with Mr. Bulliard's testimony that he ordered insurance coverage similar to that he had previously received. Furthermore, despite Fireman's Fund's assertion that the cover page that was enclosed with the 2000 insurance policy[4] demonstrates that Bulliard Farm was not issued CRC coverage for its 2000 rice crop, Mr. Bulliard testified that he believed that the cover page indicated that Bulliard Farm had the same level of coverage that it had the previous year. Finally, Mr. Bulliard testified that, upon calling to make his claim in October 2000, Mr. Buller initially told him, "Yeah, you had that CRC policy[,]" but then changed the statement to MPCI coverage after checking the file for Bulliard Farm. Consequently, we find that the record supports the trial court's finding that there was a mutual error between Mr. Bulliard and Mr. Buller regarding which level of coverage was to be provided for Bulliard Farm's 2000 crop.

---

[4] Although the record does not contain a copy of the insurance policy issued to Bulliard Farms in 2000, a copy of the cover sheet that was enclosed with the policy was submitted into the record. The cover sheet is signed by Stanley Buller, Jr. and contains a pre-printed list of crops that could be insured. A handwritten notation of "80%" appears on the line for rice and another handwritten notation of "CRC 50%" on the line for soybeans.

Allen Peterson, director of compliance for Fireman's Fund, testified at trial that Buller Insurance Agency was an authorized agent for Fireman's Fund in 2000 and had the authority to accept applications for crop insurance. He also stated that Stanley J. Buller is an authorized agent with Buller's Insurance Agency. This court has previously stated that "[a]n insurer is bound by its agent's knowledge of the true intention of the policyholder as to the coverage intended by the latter to be secured through the issuance of the insurance policy, and the policy will be equitably reformed to afford the intended coverage where the policy as issued does not contain it." *Urania Lumber v. Ins. Co. of N. Am.*, 177 So.2d 640, 642-43 (La.App. 3 Cir. 1965). We have determined above that the record contains sufficient evidence to support a finding that there was a mutual error between Mr. Bulliard and Mr. Buller regarding the level of coverage for Bulliard Farm's 2000 crop insurance. The undisputed testimony establishes that Mr. Bulliard requested CRC coverage from Mr. Buller, an agent authorized by Fireman's Fund, and that both men thought that CRC coverage had, in fact, been secured. Consequently, we find that the trial court was not manifestly erroneous in reforming the 2000 crop insurance contract between the parties to reflect CRC coverage. This assignment is without merit.

*Hearsay - Business Records Exception*

Fireman's Fund's second assignment of error concerns defendant's exhibit number 6 ("the exhibit"), which is documentation from Riviana Foods, Inc. ("Riviana") regarding Bulliard Farm's sale of their rice crop in September 2000. Over Fireman's Fund hearsay objection, the trial court accepted the records pursuant to the business records exception. Fireman's Fund argues on appeal that the exhibit represents "third party business records of Riviana Foods, Inc." for which an appropriate foundation was not presented. Fireman's Fund stated in its appellate brief

8

that "[if] the court had properly excluded the defendant's exhibit 6 as hearsay then there was no basis for awarding [any] amount for damages since there was no legally admissible evidence presented to the court."

Bulliard Farm offered as defendant's exhibit number 5 a detailed summary of the damages it was requesting, including the manner of computation for the figures.[5] Bulliard Farm requested damages of $25,749.78, which was calculated by subtracting the amount of income received from the sale of the rice ($87,669.06) from the guaranteed payment that would have been made under a CRC policy ($127,522.29), and then by reducing that figure by $14,073.45, which was the price of the CRC insurance premium quoted to Bulliard Farm. In support of these figures, Bulliard Farm introduced as defendant's exhibit number 6 the documentation from Riviana Foods, demonstrating that Bulliard Farm had, in fact, received $87,699.06 from the sale of the rice crop. Over the objection of the attorney representing Fireman's Fund, the trial judge admitted the exhibit.

The Louisiana Code of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). Unless excluded from the definition of hearsay by La.Code Evid. art. 801 or listed as an exception in La.Code Evid. art. 802, hearsay is generally not admissible. La.Code

---

[5] Defendant's exhibit number 5 first provides that Bulliard Farm would have received $127,522.29 as the guaranteed payment under a CRC policy; the document provides a detailed computation for that figure. Defendant's exhibit number 5 then outlines the actual income received from Riviana Foods for the 2000 rice crop harvest, which was $87,699.06. Defendant's Exhibit number 5 then lists Bulliard Farm's alleged damages suffered "by virtue of non-issuance of CRC policy[]" as follows:

$127,522.29 (Guaranteed payment under CRC policy)
$ 87,699.06 (Total sales of 2000 rice crop)
$ 39,823.23 DAMAGES SUFFERED
$ 14,073.45 (LESS: Quoted Insurance Premium for CRC Policy)
$ 25,749.78 Insurance Claim Payable

Evid. art. 802. Louisiana Code of Evidence Article 803 provides for the business records exception to the hearsay rule, stating in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness;
>
> ....
>
> **(6) Records of regularly conducted business activity.** A memorandum, report, record, or data compilation, in any form, including but not limited to that which is stored by the use of an optical disk imaging system, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule. The term "business" as used in this Paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. Public records and reports which are specifically excluded from the public records exception by Article 803(8)(b) shall not qualify as an exception to the hearsay rule under this Paragraph.

In the present matter, Mr. Bulliard presented the documents at issue which include a facsimile cover sheet from Riviana, five documents entitled "GRADER'S GRAIN WEIGHT CERTIFICATE" accompanied by five payment charts on Riviana letterhead with Bulliard Farms denoted as "PRODUCER[,]" and a photocopy of check number 184145 from Riviana to Bulliard Farm in the amount of $87,699.06. Mr. Bulliard testified as follows on direct examination:

Q. And, Mr. Bulliard, concerning compiling this particular again statement, did you obtain from - first off, who do you sell and who did you sell your crop to in the year 2000?

A. Riviana Foods.

Q. Is that the same firm or co-op that you sell your rice to each year?

10

A. Yes.

Q. And you've obtained from Riviana Foods again for the subject year - that is, the year 2000 - the entire payments, including tabulations of how much rice was of course harvested from your farm; and again they tabulated and provided copies of the exact check that was written to you in payment for your entire 2000 rice crop?

A. Yes.

Q. And I'm going to show you that particular document. Again it is entitled "Riviana, Foods, Incorporated, Abbeville, Louisiana". And you recognize that as what we've just spoken of?

A. Oh, yes.

Q. And of course obviously that was your crop revenue which again was used on your tabulation sheet to figure your actual crop revenue for 2000?

A. Yes.

Fireman's Fund argues in their appellate brief that "[t]he defendant failed to lay the proper foundation" regarding the documents. However, our review indicates that the documents were standard documents issued between a farming operator and the food corporation who purchased the farmer's crops. The weight certificates bear dates throughout the summer of 2000 and contain a detailed account of the weight, composition, and value of the crop that Bulliard Farm sold to Riviana in 2000. Although the documents were prepared by Riviana, Mr. Bulliard testified that the amount in the documents represented the crop revenue that he received for 2000. He stated that he used this information to calculate his damages by using the same method that had been used the prior year to figure the amount due him under his CRC policy. Due to Mr. Bulliard's statements regarding his familiarities with the figures contained therein, the trial court was free to find that Bulliard Farm did lay a proper foundation for offering the exhibits. Accordingly, we find this assignment to be without merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assigned to the plaintiff-appellant, Fireman's Fund Insurance Company.

**AFFIRMED.**